IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AGUSTIN ANGEL and<br>DANIEL ANGEL,<br><br>    Plaintiffs,<br><br>    v.<br><br>TOM RIDGE, EDUARDO AGUIRRE, JR.,<br>MICHAEL JAROMIN, and<br>CHESTER MOYER, in their official<br>capacities,<br><br>    Defendants. | Case No. 2004-cv-4121-JPG |

### MEMORANDUM OPINION AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on Defendants' motion to dismiss Counts I, II, IV and V of the amended complaint in this case (Doc. 23) and supporting memorandum of law (Doc. 24), to which Plaintiffs responded. (Doc. 27). The motion will be GRANTED.

In the event it should ever matter, let's take a minute and tidy up the record in this case a bit before moving forward. Note that on December 30, 2004, Defendants filed a (different) motion to dismiss the amended complaint (Doc. 16) (that motion preceded this motion to dismiss; so we're actually looking at Defendants' *third* such motion here), accompanied by a supporting memorandum of law. (Doc. 17). That motion to dismiss, for its part, arrived on the heels of Plaintiffs' December 1, 2004 amended complaint, which Plaintiffs apparently filed in response to the then-pending (first) motion to dismiss, which attacked the sufficiency of the *original* complaint in this case and which the *amended* complaint rendered moot. Although Plaintiffs responded to the second motion to dismiss (Doc. 17)–making it fully briefed and therefore ripe

-1-

for decision–both parties have since abandoned their respective briefs in favor of the ones presented in these pleadings.  The bottom line is that the parties have essentially thrown the second motion to dismiss and its associated response into File 13.  Therefore, the second motion to dismiss (Doc. 16) and memorandum in opposition to that motion (Doc. 19) are both **DISMISSED** as **MOOT.**

With that behind us let's begin our discussion of this case with the relevant facts, taken as true for present purposes from the amended complaint.  (Doc. 12).  Plaintiffs, brothers Agustin and Daniel Angel, are Illinois-based restauranteurs.  They "have extensive ownership interests in over [17] Mexican restaurants located in central and southern Illinois"  (Doc. 12 at 1), and for what it's worth, neither has "ever been arrested for or convicted of any crime."  (Doc. 12 at 1).  Though we're not told exactly when they arrived in the United States, Daniel must have arrived sometime before August 16, 1989–and Agustin up to seven years later–as those are the dates on which their permanent resident cards were issued to them.  Fast forwarding to late March 2003, Agustin and Daniel, believing they'd met the statutory criteria for United States citizenship, decided to take the important step and apply for it.  To that end they "completed and filed [the] appropriate application[s] for naturalization."  (Doc. 16 at 3).  Things appeared to be going well for them at that point; later that year each received his notice to appear at the St. Louis Department of Homeland Security's regional office for an in-person examination.  Conveniently, the Angels were even scheduled for back-to-back sessions that day; Agustin was slated to go first followed by his brother, Daniel.  Things went downhill from there, however–and quickly so at that.  Trouble first materialized in the form of Tyson Imming, the Immigrations and Customs Enforcement investigator who was to conduct the examinations.  That an ICE investigator was

tasked with the examinations was odd, the Angels write in their complaint, because "[i]t is extremely unusual, if not unprecedented, for [such an] interview to be conducted by an ICE representative, or in fact by anyone other than a qualified naturalization examiner." (Doc. 16 at 4). Then things went from bad to worse. Agustin is "proficient in written and spoken English," but Imming nevertheless found "that he had passed all of the applicable tests [ ] *except for* a test showing competency in written English" (Doc. 16 at 4) (emphasis added). This was done despite Imming's awareness that Agustin met the relevant criteria. What's more, during Daniel's interview "Imming began to pursue extensive questioning . . . and attempted to record the interview on audiotape." (Doc. 16 at 5). But Daniel refused and asked for a lawyer. That, in turn, brought the interview to a screeching halt–a lawyer apparently wasn't available–and "Imming . . . informed Daniel [ ] that the [ ] interview would be continued and rescheduled to a later date." (Doc. 16 at 5). Despite follow-up letters from the Angels and their lawyers, nothing was ever rescheduled. So, seeking de novo review of what they deem to be denials of their applications– DHS failed to act within 120 days of the commencement of the interviews, see 8 U.S.C. §1447(b) –the Angels have filed this action for administrative review.

Thus we reach the disturbing allegations central to this case. Here's how the Angels put it in their complaint:

> Following the . . . naturalization interviews, Imming [ ] made a series of statements disparaging Hispanics generally and Mexicans specifically. Specifically, Imming made the following statements to Agustin Angel on October 21, 2004:
>
> > a) Mexicans come to the United States to commit crimes and are criminals.
> >
> > b) Mexicans are rapists and child molesters.
> >
> > c) "You" (referring to Mexicans/Hispanics) "all" come here (to the U.S.)

>illegally.
>
>d) "You" (referring to Agustin Angel and his brother Daniel) do not pay your employees and exploit them.

(Doc. 16 at 6).  Parenthetically, it goes without saying that such statements from a federal law enforcement officer tasked with administering the Nation's immigrations laws, if true, are simply inexcusable.  Getting back on track, the Angels next tell us they were then served with notices to appear which they believe "Investigator Imming caused . . . to be issued" and approved by his supervisor.  (Doc. 16 at 6).  (A notice to appear is DHS's method of charging an immigration violation, see 8 C.F.R. §§ 239.1, 245.1(c)(9)(i)).   On this they write: "The NTA's charge that Daniel Angel and Agustin Angel are subject to removal (i.e., deportation) from the United States pursuant to §212(a)(6)(E)(i) of the Immigration and Nationality Act, in that [they] knowingly 'encouraged, induced, assisted, abetted, or aided' four identified aliens 'to enter or to try to enter the United States in violation of law.'" (Doc. 16 at 7).  The same day the notices to appear issued, they continue, "Agent Imming questioned [Agustin] outside the presence of counsel about the status of the instant suit and demanded to know why it had been brought. [ ] Agent Imming's tone and demeanor confirmed that he was aware of this action and was greatly annoyed by it."  (Doc. 16 at 8).

Among the relief the Angels seek in this case is a "judicial determination of [both of their] naturalization application[s] and a declaration that [each] is entitled to be naturalized as a citizen of the United States."  (Doc. 16 at 10, 13).  But what of the uncontested fact that each Plaintiff is now in removal proceedings?  And so the Government argues, citing 8 U.S.C. §1429 for the proposition that "[t]he pending removal proceedings against Daniel and Agustin bar adjudication of their naturalization applications by the agency and the district court."  Section 1429 provides:

> [N]o person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act. . . ."

But that argument isn't without its own problems, the Angels rejoin. For one thing, removal proceedings have only just begun in this case, so there's simply no "final finding of deportability" to speak of here. The Government seems to agree. Second, the Angels argue that §1429 is, by its express terms, a limitation on "the Attorney General's" power–not the power of "the district courts." Because the Government disagrees with this point, let's take a fresh look at it now.

The Government's position relies heavily on the circumstances leading to the current version of §1429–a provision that's seen several amendments since its enactment. In the days before §1429, the Government tells us, aliens against whom deportation proceedings had commenced often "raced" to the local courthouse, petitions for naturalization in hand, to prevent deportation. *Voila*, that was the problem. Courts were free to decide naturalization petitions despite the pendency of deportation proceedings–and often before deportation proceedings concluded, the only point at which "deportation" meant anything–and that led to the anomalous result that an otherwise deportable alien therefore ineligible for naturalization might find himself naturalized anyway. Enter §1429. It provided that "no petition for naturalization shall be finally heard . . . if there is pending against the petitioner a deportation proceeding." *Shomberg v. United States*, 348 U.S. 540, 541 (1955), citing §1429 as then effective. Interestingly, the first version of §1421 spread the power to naturalize among "district courts, territorial courts, and state courts of record," *Gorbach v. Reno*, 219 F.3d 1087, 1089 (9th Cir. 2000), though its current version (enacted in 1990) vests the "sole authority to naturalize persons as citizens of the United States . . .

upon the Attorney General." 8 U.S.C. §1421(a). It's therefore no surprise that, as part of the same 1990 amendments which amended §1421(a), Congress also amended §1429 to limit "the Attorney General" from considering naturalization petitions filed by aliens in removal proceedings. Given that the Attorney General has the sole authority to naturalize, there's simply no one else to whom Congress could direct that limitation.

That said, the million-dollar question therefore becomes what effect the most recent amendment to §1429 has on judicial review. On that score, §1421(c) provides:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

Recall in this case that Imming continued the Angels' in-person examination and DHS never rescheduled it. According to the Angels, this means 8 U.S.C. §1447(b) also applies. It provides:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

In light of these provisions, the parties go back and forth about whether "jurisdiction" exists in this forum over the Angels' appeal. The Court sees the issue as one of primary jurisdiction–not subject matter jurisdiction–however. In the Court's view, subject-matter jurisdiction plainly exists under §1447(b). Granted, one might say that §1447(b)'s 120-day period was meant to run from the date an examination is completed, not when it began, and in this case, because the examination was never completed, the clock hasn't started running yet. But consider 8 C.F.R. §335.3(b) which, in

addressing the time limits for rescheduling failed examinations, states as follows: "[T]he reexamination on the *continued* case shall be scheduled within the 120-day period after the initial examination. . . ." (Emphasis added).  8 C.F.R. §312.5(b) jibes with this reading.  "Before an applicant may request a postponement of the second examination to a date that is more than 90 days after the initial examination, the applicant must agree in writing to waive *the requirement* under section 336 of the Act that the Service must render a determination on the application within 120 days from *the initial interview*." (Emphasis added).

      So the Court has jurisdiction over this appeal and must therefore decide whether to afford DHS "first crack" over it.  *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004).  The answer is yes.  Given that the issue here is one of primary jurisdiction, the cases cited by the Angels are distinguishable at the threshold.  Granted, the Court agrees that those cases–*Grewal v. Ashcroft*, 301 F.Supp.2d 692 (N.D. Ohio 2004), and *Ngwana v. Attorney General*, 40 F.Supp.2d 319 (D. Md. 1999)–are factually on point with this case in that all involved removal proceedings begun *after* denials of naturalization petitions.  Indeed, that similarity is probably what led both courts–and the Angels, for that matter–to make a pair of similar, yet unavailing, arguments.  First, they see in removal an attempt to oust this Court of jurisdiction.  But naturalization and removability overlap significantly; because one who is removable cannot be naturalized, the set of removable offenses is a subset of the set of reasons to deny naturalization.  8 U.S.C. §1429 itself makes this clear.  Moreover, the Angels must concede that, as practical matter, DHS, like all other Executive agencies, lacks the resources to investigate everyone physically present in the United States.  Therefore, a number of removable aliens are necessarily flying under the radar screen at any given time, to put it colloquially.  When those aliens skyline themselves by filing naturalization

applications, however–which entail extensive personal background investigations–the facts supporting removability become apparent to DHS. So unlike the Angels and the courts in *Grewal* and *Ngwana*, this Court finds nothing inherently wrong with removal proceedings simply because they might have begun after a naturalization application was filed. Second, we're told that removal proceedings begun under circumstances like those at issue here might reflect racial animus toward the aliens. While the Court reiterates its view that racial animus isn't to be condoned under any circumstances–this is especially so where it allegedly originates in the agency specifically tasked with fairly dealing with people of every race–it's hard to see how such motivations, even if true, make a difference for present purposes. The analogy is to *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. . . ."), and *United States v. Armstrong*, 517 U.S. 456, n.2 (1996) ("We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of race."). Indeed, even if one assumes the Angles have made *Armstrong's* threshold showing of racial discrimination in this case–and further assuming one reads cases like *United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002), as mandating dismissal of the removal proceedings here to the extent racial discrimination is later proven–that's still an argument to be made in the removal proceedings themselves, and in the event of an adverse decision, on appeal to the Seventh Circuit.

      However all that may be, there are good reasons for awaiting the ICE's determination of removability in this case. Note that in *Grewal* and *Ngwana* the grounds for denial of naturalization were identical to those advanced for removal. Therefore, in terms of primary jurisdiction, DHS

had already had one "crack" at the problem. The same can't be said in this case. The Angels weren't naturalized because Imming thought their English wasn't up to par; removal, by contrast, is being pursued for alien smuggling. Second, and related to the first reason, even were the Court to find for the Angels on the merits of their claims, the Court is wholly without the power to naturalize them. Section 1421(a), for its part, makes this point clear. Third, there's little reason to think the Court's view of the Angels' English-speaking ability would effect ICE's determination of their removability, as the rulings in *Grewal* and *Ngwana* might have done for those aliens. Finally, and significantly, there's no claim that a United States citizen is being denied recognition of his citizenship. See *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). So in the final analysis, the Court suspects that if the removal proceedings brought against the Angels in this case are as "frivolous" and "baseless" as they claim them to be (Doc. 27 at 14), the system in place is capable of adequately addressing the problem.

Because the claims made in Counts I, II, IV and V of the amended complaint should not be adjudicated until after the removal proceedings against Plaintiffs Agustin Angel and Daniel Angel are finally resolved, Defendants' motion to dismiss (Doc. 23) is **GRANTED** and those claims are **DISMISSED without prejudice**.

**IT IS SO ORDERED.**

**Dated: May 25, 2005.**

                                                    **/s/ J. Phil Gilbert**
                                                    **J. PHIL GILBERT**
                                                    **U.S. District Judge**